# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Gordon D. Paulson, Jr.,                                    Civ. No. 10-4935 (JRT/JJK)

      Plaintiff,

v.                                                **REPORT AND RECOMMENDATION**

Michael J. Astrue,
Commissioner of Social
Security,

      Defendant.

---

Sean M. Quinn, Esq., counsel for Plaintiff.

Lonnie F. Bryan, Esq., Assistant United States Attorney, counsel for Defendant.

---

JEFFREY J. KEYES, United States Magistrate Judge

      Pursuant to 42 U.S.C. § 405(g), Plaintiff Gordon Paulson, Jr. seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's applications for disability-insurance benefits and supplemental security income.  The parties have filed cross-motions for summary judgment.  (Doc. Nos. 7, 13).  This matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 72.1.  For the reasons stated below, this Court recommends that Plaintiff's motion for summary judgment be granted and Defendant's motion for summary judgment be denied.

# BACKGROUND

## I.    Procedural History

Plaintiff filed his application for disability insurance benefits on May 3, 2006 and his application for supplemental security income on May 25, 2006, alleging a disability onset date of September 19, 2002.  (Tr. 124–27, 128–30.)[1]  The applications were denied initially and on reconsideration.  (Tr. 73–77, 84–89.) Plaintiff timely requested a hearing, which was held before an Administrative Law Judge ("ALJ") on February 4, 2009.  (Tr. 94, 22–61.)  On August 25, 2009, the ALJ issued an unfavorable decision.  (Tr. 8–21.)  Plaintiff sought review of the ALJ's decision, but the Appeals Council denied the request for review on November 4, 2010.  (Tr. 1–5.)  The denial of review made the ALJ's decision the final decision of the Commissioner.  *See* 42 U.S.C. § 405(g); *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005); *Browning v. Sullivan*, 958 F.2d 817, 822-23 (8th Cir. 1992).

On December 20, 2010, Plaintiff filed the instant action with this Court seeking judicial review pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).  The parties thereafter filed cross-motions for summary judgment.  *See* D. Minn. Loc. R. 7.2.

---

[1]    Throughout this Report and Recommendation, reference to the Administrative Record (Doc. No. 6), for this case is made by using the abbreviation "Tr."

## II.   Statement of Facts

Plaintiff was born on April 3, 1969.  (Tr. 124.)  At the time of his alleged

onset of disability on September 19, 2002, he was 33-years-old.  Plaintiff has a

GED.  (Tr. 188.)  He has work experience in the following occupations:

"numerical control machine," at a skilled and medium exertional level; "operator

surveyor helper," at a semiskilled and heavy exertional level; "die polisher," at a

skilled and heavy exertional level; and "salvage worker (auto)," at an unskilled

and heavy exertional level.  (Tr. 293.)  Plaintiff alleged that pain from an ankle

injury, PTSD, anxiety and depression prevent him from working.  (Tr. 180.)

Plaintiff was injured and taken to Mercy Hospital on September 19, 2002.

(Tr. 415.)  He had been working on a car, which fell from a hoist and hit his

forehead and cheek.  (*Id.*)  When Plaintiff fell, he hurt his left ankle.  (*Id.*)  On

examination, Plaintiff had small abrasions on his forehead and cheek, no

significant swelling of his left ankle, but pain with range of motion.  (*Id.*)  X-ray of

his left ankle was negative.  (Tr. 416.)  Plaintiff was provided a splint and

crutches and prescribed Tylenol or Tylenol #3 for pain.  (Tr. 415.)

On October 3, 2002, Plaintiff saw Dr. Dan Malkovich at Raiter Clinic about

his work injury.  (Tr. 346.)  Plaintiff reported there was swelling and discoloration

at the time of his ankle injury, but it had resolved.  (*Id.*)  Plaintiff's pain had

increased, and he could not put any weight on his left ankle.  (*Id.*)  On

examination, there was no swelling of his ankle, but range of motion was limited

by pain.  (*Id.*)  Dr. Malkovich recommended partial weight bearing with crutches,

3

and that Plaintiff remain off work for two weeks.  (*Id.*) Plaintiff had similar findings when he saw Dr. Peter Goldschmidt at Orthopaedic Associates of Duluth on October 8, 2002.  (Tr. 327.)  Dr. Goldschmidt diagnosed left ankle sprain.  (*Id.*)

Plaintiff was also assessed for physical therapy on October 8.  (Tr. 316.) He presented with decreased strength and range of motion of his ankle, and pain limiting his functional mobility.  (*Id.*)  His long term goal was for pain-free range of motion to allow him to work as a mechanic.  (Id.)  Within two weeks, he hoped to decrease his pain from a level seven out of ten to four, and to sleep through the night.  (*Id.*)  After three sessions of physical therapy, Plaintiff was discharged on October 31, 2002.  (Tr. 314.)

On October 25, 2002, Dr. Malkovich noted Plaintiff's ankle was fairly unremarkable, with good range of motion and no edema.  (Tr. 345.)  Plaintiff requested stronger pain medication.  (Tr. 346.)  Plaintiff also reported stressors and symptoms of decreased sleep, decreased interest in activities, feelings of guilt over inactivity, and decreased concentration.  (Tr. 345.)  Dr. Malkovich prescribed Prozac.  (*Id.*)  When Plaintiff saw Dr. Goldschmidt on November 5, 2002, there was significant decrease in the swelling of his ankle, but he continued to feel pain.  (Tr. 329.)  A stress x-ray was negative.  (*Id.*) Dr. Goldschmidt diagnosed resolving left ankle sprain.  (*Id.*)

Plaintiff had a preoperative examination for hernia surgery on December 19, 2002. (Tr. 344.)   Plaintiff requested Xanax to address his anxiety, insomnia and restlessness.  (*Id.*)  Dr. Malkovich had already prescribed Prozac, which he

4

increased, and he prescribed Lorazepam (Ativan).  (*Id.*)  Dr. Malkovich also directed Plaintiff to walk with only partial weight bearing on his ankle.  (*Id.*)

On December 30, 2002, Plaintiff had surgery to correct right inguinal hernia.  (Tr. 319.)  At that time, Plaintiff's medical history included anxiety, nervousness, depression and left ankle injury.  (Tr. 320.)  His medications included Prozac, Xanax and Darvocet.  (*Id.*)  Plaintiff complained of anxiety, trouble sleeping, restlessness, and difficulty walking on his left ankle.  (*Id.*)  On examination, Plaintiff's knee and ankle reflexes were normal, and he had good range of motion with the left ankle.  (Tr. 321.)

Plaintiff saw Dr. D.J. Van Heerde at Raiter Clinic on March 17, 2003, and complained of increasing depression and anxiety.  (Tr. 343.)  He reported symptoms of impending doom, poor sleep and irritability.  (*Id.*)  His medications were Prozac, Lorazepam and Ultram.[2]  (*Id.*)  Dr. Van Heerde switched Plaintiff from Prozac to Amitriptyline and directed Plaintiff to use Xanax for severe anxiety.  (*Id.*)

The next day, Plaintiff, accompanied by his qualified rehabilitation consultant ("QRC"), followed up with Dr. Goldschmidt.  (Tr. 328–29.)  On examination, there was no significant swelling of Plaintiff's left ankle, and he had full range of motion but also tenderness with palpation.  (*Id.*)  Another x-ray was

---

[2]     Ultram, also called tramadol (generic), is a synthetic opioid analgesic indicated for management of moderate to moderately severe pain, which may cause withdrawal if stopped abruptly. *Physician's Desk Reference ("PDR")* 2551-53 (59th ed. 2009).

taken, and it showed "evidence of calcification of the posterior malleolus which is probably consistent with an avulsion[3] injury." (*Id.*)  Dr. Goldschmidt opined that it would be reasonable for Plaintiff to have an MRI due to the protracted nature of his symptoms.  (Tr. 328.)  The MRI of April 2, 2003 showed a "focal cystic change with marrow edema at the medial corner of the talar dome, likely a sequelae of osteochondral fracture, less likely osteochondritis dissecans.[4]" (Tr. 331.)  "In addition, there was some thickening anterior tibial fibular ligament . . ."  (Tr. 328, 331.)

When Plaintiff saw Dr. Van Heerde on April 4, 2003, his pain was well-controlled on Ultracet,[5] and he was doing better with Amitriptyline.  (Tr. 343.) Plaintiff still experienced anxiety even though he was taking two or three Xanax throughout the day.  (*Id.*)  He also complained of a "sand in a plastic cup" noise in

---

[3]     Avulsion means a tearing away or forceful separation.  *Stedman's Medical Dictionary* 175 (28th ed. 2006).

[4]     The cartilage lining of the anklebone can be bruised when a sprain of the ankle occurs.  As the anklebone (the talus) twists inside its box-like housing, the edge of the talus rubs up and hits the end of the tibia.  This causes a bruise and leads to softening of the cartilage.  It may lead to a small crack in the cartilage and a cyst forming in the talus bone.  This we refer to as an osteochondral injury of the talus.  An older term for this, which we do not use any longer, is called Osteochondritis Dissecans.  . . . If the defect in the talus is significant, the ankle may need to be fused to eliminate the pain.

http://www.mdmercy.com/footandankle/conditions/ankle_injury/osteochondral.html, lasted visited September 30, 2011.

[5]     Ultracet, like Ultram, is a synthetic opioid analgesic.  *PDR* at 2549-51.

his ears.  (*Id.*)  Plaintiff was referred for cervical immobilization, and his Amitriptyline was increased.  (*Id.*)  On August 22, 2003, Plaintiff felt great, the best he felt since his accident.  (Tr. 459.)

Plaintiff saw Dr. Van Heerde on January 19, 2004, and reported increased anxiety.  (Tr. 342.)  He requested a different medication and referral for counseling.  (*Id.*)  Plaintiff was sleeping well on Amitriptyline, and Dr. Van Heerde prescribed BuSpar.  (*Id.*)

Next, Plaintiff saw Dr. Diane Palkert at Orthopaedic Foot and Ankle Center on March 30, 2004.  (Tr. 485–86.)  Plaintiff was apprehensive about his left ankle examination and had some mild discomfort with passive range of motion and some swelling was noted.  (Tr. 485.)  He had full strength and range of motion in the left ankle on examination.  (*Id.*)  Based on Plaintiff's MRI, Dr. Palkert diagnosed left ankle osteochondral fracture.  (*Id.*)  She recommended arthroscopic drilling and debriding of the lesion because of his persistent pain. (Tr. 487.)  Plaintiff underwent a preoperative examination on April 21, 2004, for arthroscopy of the left ankle.  (Tr. 341.)  His complaints included "fairly frequent" headaches, neck and shoulder problems, tinnitus of the left ear, and joint pain in the knees, neck and ankle.  (*Id.*)  There were no contraindications for surgery. (*Id.*)

Dr. Palkert performed left ankle arthroscopy for left talar osteochondritis dissecans lesion on April 27, 2004.  (Tr. 366–67.)  Plaintiff returned for follow up five weeks later, on May 25.  (Tr. 390.)  He had an incident of falling on his ankle

7

on May 4 and went to the emergency room to seek treatment for pain.  (*Id.*,

Tr. 412.)  Plaintiff continued to have pain shooting from his toes up his leg, but it

was improving.  (*Id.*)  There was no swelling on examination.  (*Id.*)  Dr. Palkert

recommended that Plaintiff remain non-weight bearing but aggressively work on

ankle range of motion and strengthening the left leg.  (*Id.*)  Dr. Palkert opined

Plaintiff could return to work in a sitting job, and it would be a year before they

would know if he was completely healed.  (Tr. 391.)

On August 4, 2004, Dr. Palkert noted that Plaintiff continued to use

crutches three months after surgery.  (Tr. 389.)  He continued to complain of pain

and swelling in the left ankle, but swelling was minimal on examination.  (*Id.*)

Plaintiff had full strength with flexion, inversion and eversion.  (*Id.*)  An x-ray

showed no collapse of the talar dome.  (*Id.*)   Dr. Palkert recommended that

Plaintiff advance weight bearing on his ankle.  (*Id.*)  She opined he would still

need a sedentary job and physical therapy.  (Tr. 388.)

Plaintiff followed up with Dr. Palkert on October 12, 2004, and reported

that although he had been instructed to discontinue use of crutches, it was three

weeks before he could walk with a cane, and he still used crutches outdoors.

(Tr. 387.)  He complained of diffuse and stabbing foot pain.  (*Id.*)  On

examination, there was no swelling and Plaintiff was hypersensitive over the

peroneal nerve.  (*Id.*)  He had discomfort with range of motion.  (*Id.*)  Dr. Palkert

strongly recommended that Plaintiff start putting more weight on the ankle and

begin physical therapy.  (*Id.*)

8

On October 22, 2004, Plaintiff underwent an independent medical evaluation by Dr. Stephen Barron in connection with his workers compensation claim. (Tr. 380-83.) Dr. Barron reviewed Plaintiff's medical records. (Tr. 380–81.) Plaintiff was not working and had a restriction of a sitting job only. (Tr. 381.) Plaintiff's daily ankle pain was aggravated by walking, running, standing and any movement. (*Id.*) His ankle pain decreased with elevation, rest and ice. (*Id.*)

Plaintiff also had daily neck pain with side to side movement, and no relief. (*Id.*) He had constant ringing in his ears and headaches three times a week. (Tr. 382.) Plaintiff was not doing exercises, and he used a cane full time for ankle pain. (*Id.*) In his free time, Plaintiff watched television and played video games. (*Id.*)

On examination, Plaintiff walked with a limp on the left. (*Id.*) He had full range of motion of his cervical spine. (*Id.*) He had 20 degrees dorsiflexion, 35 degrees plantar flexion, and 30 degrees of inversion and eversion of his left ankle. (*Id.*) Sensory examination of both lower extremities was normal, reflexes were normal, and Plaintiff had excellent strength. (*Id.*) There was no swelling and no evidence of spasm. (*Id.*) Dr. Barron opined that Plaintiff could work full-time in a primarily sedentary job, with no lifting over twenty pounds, and no repetitive stair or ladder climbing. (Tr. 383.) He recommended a follow up MRI. (*Id.*) Plaintiff then had physical therapy in November and December 2004. (Tr. 456-58.)

On December 7, 2004, Plaintiff was tentative about bearing weight on his left ankle. (Tr. 386.) He did, however, note a definite improvement in his symptoms. (*Id.*) On examination, he had minimal swelling, mild discomfort with gentle range of motion, and full strength. (*Id.*) He continued to walk with a cane. (*Id.*) Dr. Palkert believed that a "fair number" of his symptoms were related to his gait change, and should gradually resolve with increasing strength. (*Id.*)

On January 6, 2005, Plaintiff was evaluated by Dr. John (Jed) Downs at Duluth Clinic Occupational Medicine. (Tr. 492.) In addition to his ankle problem, Plaintiff was having significant problems with headaches and with concentrating and focusing. (*Id.*) He had constant tinnitus, decreased neck mobility, and emotional lability in terms of anger, anxiety and depression. (*Id.*) Dr. Downs ordered neuropsychometric testing and continued physical therapy. (Tr. 493–94.) He found Plaintiff to have cranial restrictions but "not much in the way of significant cervical restrictions." (Tr. 493.) He believed Plaintiff was likely suffering from a traumatic brain injury. (*Id.*)

Ten months after his surgery, on February 8, 2005, Plaintiff reported to Dr. Palkert that he could walk very short distances without his cane. (Tr. 476.) He continued in physical therapy once or twice a week. (*Id.*) On examination, Plaintiff was hesitant to bear weight on his left ankle and walked with an antalgic gait. (*Id.*) On examination, there was no swelling or pain with passive range of motion but there was diffuse weakness. (*Id.*) Dr. Palkert restricted Plaintiff to a

sitting job and released him to drive, but Plaintiff did not feel he had the strength to push the clutch on his car.  (*Id.*)

Plaintiff underwent a neuropsychological evaluation by Dr. Gregory Murrey at Polinsky Medical Rehabilitation Center on March 2, 2005.  (Tr. 402–06.) Plaintiff reported a "probable traumatic brain injury" from his accident on September 19, 2002, when a car he was working on fell off a hoist and hit him on the head.  (Tr. 402.)  Plaintiff reported that he was healthy before the incident. (*Id.*)  His present symptoms were constant ringing in the ears, difficulty with reading recall, word finding, short-term memory, ability to express himself, remembering appointments, completing tasks and remembering to take medication.  (*Id.*)  He was presently living with his father.  (*Id.*)

In the clinical interview, Plaintiff was alert, oriented and cooperative but exhibited decreased word finding abilities and slower processing.  (Tr. 403.) Plaintiff reported having night terrors after his accident, and difficulty with fatigue during the day.  (*Id.*)  He was having difficulty dealing with stressors and was anxious with some periods of depression.  (*Id.*)

During testing, Plaintiff demonstrated adequate attention span and appeared motivated to put forth a good effort.  (*Id.*)  He understood and retained instructions.  (*Id.*)  His spontaneous conversation was appropriate, albeit mildly slowed.  (*Id.*)  His mood and affect were dysthymic and restricted, and he was mildly tense.  (*Id.*)

On the Wechsler Memory Scale, Plaintiff scored high average in most areas. (Tr. 403.) On the Trail-Making Test, his mental flexibility and speed of information processing were within normal limits. (*Id.*) Plaintiff had one score of "mildly slow" on a test of attention, concentration and vigilance, but his other scores of attention and concentration were within normal limits. (Tr. 404.)

Plaintiff scored low on an accuracy test of design copy. (*Id.*) He also scored "below expected limits" on a test of problem solving and higher level adaptive functioning. (*Id.*) IQ testing resulted in an estimated full scale IQ of 116. (Tr. 405.) Plaintiff's score of 23 on the Beck Depression Inventory was within the significant clinical range. (*Id.*) Plaintiff scored in the upper percentile of reading tests. (*Id.*)

Dr. Murrey opined that there did not appear to be any decline in intellectual functioning from premorbid status, but he noted at least a moderate level of depressive symptoms. (Tr. 406.) Plaintiff was intact in the areas of auditory and visual memory, mental flexibility, word fluency, visual organization, and visual spatial functions. (*Id.*) Overall, there were some noticeable weaknesses that might have been a decline from premorbid level in information processing, attention to detail, general processing and general mental efficiency. (*Id.*)

Dr. Murrey opined that Plaintiff's possible mild cognitive decline could be attributable to his injury but likely was exacerbated by his mood disorder, sleep problems and other physical symptoms. (*Id.*) He diagnosed depressive disorder secondary to a medical condition and cognitive disorder, NOS. (*Id.*) Dr. Murrey

12

stated, "[i]f the patient were clear to return to work from a physical and psychological standpoint, would not see his mild cognitive weaknesses to be a significant barrier to successful return to work." (*Id.*)

Plaintiff attended five sessions of physical therapy between February 21 and March 17, 2005, and his gait improved. (Tr. 452.) When Plaintiff saw Dr. Downs again on March 22, 2005, he complained of ankle pain. (Tr. 495.) His pain was down to a level three on most days, and he could walk short distances without a cane, but he had difficulty pivoting and walking over uneven terrain. (*Id.*) He had restricted range of motion in both ankles. (*Id.*) Dr. Downs prescribed Cymbalta for depression, and he did not think anything could be done for traumatic brain injury. (Tr. 496.)

On March 28, 2005, Plaintiff had a repeat MRI of his left ankle. (Tr. 408.) The MRI findings were bone edema within the talus and in the medial malleolus of the distal tibia. (*Id.*) There was also a one centimeter cyst along the talus, with overlying cortical erosion and tinier cysts lateral to the area, and a cleft in the talus that had the appearance of a fracture. (*Id.*) The tendons and ligaments were intact. (*Id.*)

Plaintiff reported to Dr. Palkert on April 12, 2005, that he was improving with physical therapy, and he could walk longer distances without his cane but used the cane for prolonged walking. (Tr. 475.)   On examination, there was no swelling or pain with range of motion. (*Id.*) Plaintiff had full strength and not much discomfort. (*Id.*) Dr. Palkert noted however, the MRI showed no evidence

13

the lesion was healing, and there continued to be edema within the talus.  (*Id.*)

She recommended continued physical therapy.  (*Id.*)  Dr. Palkert gave Plaintiff

work restrictions for a "sitting job only", with no climbing, kneeling, squatting or

lifting, and "no standing/minimal walking."  (Tr. 551.)

On April 22, 2005, Plaintiff told Dr. Downs that he thought his ankle was

worse after the surgery.  (Tr. 498.)  His foot ached, even after taking Ultracet.

(*Id.*)  Plaintiff was taking Effexor for anxiety, depression, and chronic pain but

said he was still angry at times.  (*Id.*)  Plaintiff was concerned about finding

sedentary employment, and that he would never be able to walk over uneven

terrain to go hunting.  (Tr. 499.)  He rated the pain in his left ankle at level six.

(*Id.*)  Dr. Downs increased Plaintiff's Effexor and stated, "[a]t this point in time, it

is fairly clear that [Plaintiff] will not be able to return to anything beyond sedentary

class work." (*Id.*)   Dr. Downs completed a Medical Opinion form for Plaintiff on

May 9, 2005, and restricted him to sedentary work and to limit walking and

standing as much as possible.  (Tr. 547.)

Plaintiff saw Dr. Downs again on May 20, 2005, and his pain was at a

steady level of five out of ten.  (Tr. 500.)  Plaintiff was using a brace on his ankle

part-time.  (*Id.*)  His irritability had improved some.  (*Id.*)  He continued to have

neck problems and ringing in his ears.  (*Id.*)  He was also having repeat episodes

of reliving the accident of the car falling towards him.  (*Id.*)  Plaintiff had an

audiogram that showed some sensorineural hearing loss.  (Tr. 501.)  Dr. Downs

diagnosed probable post traumatic stress disorder and recommended counseling

14

and physical therapy.  (*Id.*)  He restricted Plaintiff to sedentary work with limited use of foot controls, maximum two hours per day on his feet and avoidance of squatting and climbing.  (*Id.*)

On June 2, 2005, Dr. Downs opined that Plaintiff could not compete in the marketplace due to post traumatic stress disorder, traumatic brain injury, and osteochondritis dissecans of his left ankle preventing him from bearing weight on the left for substantial periods of time.  (Tr. 535.)  He noted that Plaintiff might be able to do sedentary work, but he did not have transferable skills.  (*Id.*)  He restricted Plaintiff to being on his feet two hours per day.  (*Id.*)

Plaintiff was feeling better when he saw Dr. Downs on August 23, 2005.  (Tr. 502.)  He reported continued problems with memory, concentration and anxiety.  (*Id.*)  Plaintiff tried to wean off Xanax but was too irritable.  (*Id.*)  He had persistent nightmares about his legs missing.  (*Id.*)  Dr. Downs recommended continued physical therapy and treatment for PTSD.  (Tr. 503.)  He noted Plaintiff could drive a car but would need sedentary work and to avoid climbing and squatting.  (*Id.*)

Plaintiff underwent an independent neuropsychological examination with Dr. Thomas Beniak in connection with his workers compensation claim on September 9, 2005.  (Tr. 590–610.)  Dr. Beniak reviewed Plaintiff's medical records, conducted an interview, administered neuropsychological testing, and administered an objective personality assessment.  (Tr. 590.)  Plaintiff described his work accident to Dr. Beniak in detail.  (Tr. 591–92.)

Dr. Beniak noted Plaintiff's attention span was excellent, his motivation was very good, and he understood and remembered instructions well.  (Tr. 599.) Plaintiff's mood was suggestive of underlying dysphoria, and there were signs of anxiety with obsessional features including ruminative tendencies and indecisiveness.  (*Id.*)  "Anxiety-driven inability to respond in a timely fashion was very apparent."  (*Id.*)  There was no evidence of malingering but anxiety might have affected Plaintiff's test performance.  (Tr. 599-600.)

Plaintiff's full scale IQ score was 109, and Plaintiff's intellectual skills favored verbal over perceptual measures.  (Tr. 600.)  There was no evidence of any intellectual deterioration since the February 2005 evaluation.  (*Id.*) There was no hint of word finding problems.  (*Id.*)  Plaintiff's memory testing ranged from "very superior" to mildly impaired on immediate recall.  (*Id.*)  Sustained vigilance was mildly impaired, and had been much better in the earlier evaluation. (Tr. 602.)

Dr. Beniak also administered the MMPI-2 personality test.  (Tr. 602.)  The test suggested Plaintiff had a moderate level of psychological distress accompanied by moderate to severe depression.  (Tr. 603.)  Dr. Beniak opined:

> [t]his level of depression is often accompanied by a distinct measure of functionally determined cognitive inefficiency.  Attention, concentration, and efficiency of thinking are commonly disrupted on purely psychological grounds.

(*Id.*)  Moderate levels of anxiety, tension and nervousness interacted with the depressive features "to undermine overall adjustment."  (*Id.*)  Obsessional

16

personality traits included indecisiveness, ruminative tendencies, and extreme self-doubt.  (*Id.*)

Prominent somatic-neurotic features were also present.  (*Id.*)  Dr. Beniak opined that "[w]hile far from precluding all bona fide organic symptomatology, these features suggest some accentuation of physical symptomatology on a psychological basis."  (*Id.*)  There were no indications of major psychopathology such as impaired reality or paranoid features, but there was evidence of mild characterological problems, including passive-aggressive personality traits and heavy reliance upon psychological defenses.  (Tr. 604.)

Dr. Beniak opined that it was highly unlikely Plaintiff sustained a traumatic brain injury as a consequence of his work injury in 2002, and strictly on the basis of neuropsychological status, Plaintiff would have no vocational restrictions or restrictions on activities of daily living.  (Tr. 607, 609.)  He further opined that Plaintiff was in need of psychiatric and psychological care.  (Tr. 610.)

When Plaintiff saw Dr. Palkert on October 25, 2005, he was still using Ultracet three times a day for pain in his foot and ankle.  (Tr. 474.)  On examination, there was no swelling or erythema, and Plaintiff complained of mild pain with flexion, inversion and eversion.  (*Id.*)  Plaintiff walked with a significantly antalgic gait.  (*Id.*)  Dr. Palkert injected Plaintiff's ankle with a mixture of lidocaine. (*Id.*)  In December, Plaintiff reported the injection had not provided relief, and he was at baseline with daily ankle pain.  (Tr. 473.)  Dr. Palkert released Plaintiff to

find a job that did not require prolonged standing and walking.  (*Id.*)  She felt he had reached maximum medical improvement.  (*Id.*)

Plaintiff was evaluated by Dr. Brian Konowalchuk at Duluth Clinic on January 4, 2006.  (Tr. 504.)  Plaintiff carried a cane and walked with a minor limp, but it was not clear if he needed the cane to walk.  (Tr. 505.)  Dr. Konowalchuk reviewed Plaintiff's history and diagnosed depression, osteochondritis dissecans of the left ankle, and possible traumatic brain injury "with possible minor deficits but with no clear limitation to employment or work ability."  (*Id.*)  He recommended counseling for depression and believed Plaintiff's depression was likely co-existing separate from his work-related injury.  (*Id.*)  Dr. Konowalchuk opined Plaintiff could work with medium lifting but no prolonged standing or walking.  (*Id.*)

On February 1, 2006, Plaintiff saw Dr. Downs, who opined Plaintiff was not at maximum medical improvement for his foot and ankle injury.  (Tr. 669.) Dr. Downs opined Plaintiff could perform sedentary work and probably could lift twenty pounds from a sitting position, if he did not have to lift overhead. (Tr. 670.)  Dr. Downs also advocated that Plaintiff have treatment for traumatic brain injury.  (*Id.*)

At the request of his attorney, Plaintiff underwent an independent psychiatric examination with Dr. Joseph Sivak on February 21, 2006.  (Tr. 572– 85.)  Plaintiff reported he never had any need for psychiatric treatment before his accident in September 2002.  (Tr. 572.)  About six months after the accident, he

18

started having nightmares several times a week about his legs missing. (Tr. 573.) Plaintiff also reported intense psychological distress from the smell of diesel fuel, which was present during the accident. (Tr. 573–74.)

Plaintiff's wife said he used to be calm and now was very volatile. (*Id.*) He was unable to control his angry, inappropriate outbursts. (*Id.*) Plaintiff also had difficulty reading and concentrating. (*Id.*) At times, he felt isolated and estranged from others. (*Id.*) Plaintiff reported that he never took psychiatric medications before the accident. (Tr. 575.) Dealing with his workers compensation claim made his anxiety, irritability and anger much worse. (*Id.*) He felt sad, hopeless and helpless frequently. (*Id.*) He had low motivation, low energy and low self-esteem. (*Id.*) For pain relief, he used Ultracet three or four times a day. (*Id.*) His other medications included Amitriptyline, Xanax, and Effexor. (*Id.*)

Dr. Sivak stated that "it should be noted on an MMPI that was performed [at Miller Dwan] there [were] prominent somatic/neurotic features that were present and obsessional personality characteristics are also indicated and moderate to severe level of depression. . ." (*Id.*) Plaintiff's social history revealed drug and alcohol abuse. (Tr. 576.) He lost his driver's license due to a DUI about ten years earlier. (*Id.*)

During the interview, Plaintiff was engaging, cooperative and forthcoming. (Tr. 577.) His speech was normal and affect went from blunted and withdrawn to slightly agitated and anxious to sarcastically angry but well-controlled. (*Id.*) Plaintiff did not spontaneously laugh or smile, and his affect was depressed. (*Id.*)

19

His thought form was generally normal but at one point was "perseverating and tangential in a rather obsessional fashion regarding the accident." (*Id.*)  His presentation gave "a hint of hypervigilance and guardedness and non-delusional paranoid type symptoms." (*Id.*)  Dr. Sivak diagnosed post traumatic stress disorder and depression secondary to a general medical condition.  (Tr. 578.)  He assessed a GAF score of 37.[6] (*Id.*)  Dr. Sivak had some concern over Plaintiff's use of pain medication that could exacerbate depression and anxiety, and Xanax, an addictive drug that could actually strengthen anxiety if used over time. (Tr. 580.)

Dr. Sivak wrote to Plaintiff's attorney on February 24, 2006.  (Tr. 783.) Dr. Sivak opined that Plaintiff had multiple symptoms consistent with and strongly suggestive of chronic post traumatic stress disorder that occurred as a result of the injury.  (*Id.*)  Dr. Sivak recommended that Plaintiff's medications be managed more closely and aggressively, and that he obtain insight-oriented psychotherapy to gain mastery over PTSD symptoms and to cognitively cope more effectively. (Tr. 785.)

Dr. Beniak disagreed with some of Dr. Sivak's conclusions and opined that Plaintiff did not sustain a work-related traumatic brain injury and did not exhibit organically determined cognitive deficits of short-term or recent memory.

---

[6]     A GAF score of 31 to 40 indicates major impairment in several areas, such as work or school, family relations, judgment, thinking or mood.  Diagnostic and Statistical Manual of Mental Disorders 34 (American Psychiatric Association 4th ed. text revision 2000) ("*DSM-IV-tr*").

(Tr. 584.)  Dr. Beniak also opined some of Plaintiff's psychiatric problems likely pre-existed his work injury, particularly his "characterological problem," chemical dependency issues, and social isolation.  (Tr. 585.)  He also disagreed with the diagnosis of PTSD, noting the accident never presented a serious threat, nor did Plaintiff respond in a helpless fashion.  (*Id.*)  Dr. Beniak believed Plaintiff's symptoms were better explained by his severe depression.  (*Id.*)

Dr. Beniak also disagreed with Dr. Downs' recommendations for cognitive retraining, as Plaintiff's neuropsychological test scores did not provide evidence of organically determined cognitive deficits.  (Tr. 588.)  He opined that minor variations and fluctuations in Plaintiff's attentional capacity, learning and short-term memory were secondary to his psychiatric state.  (*Id.*)  Dr. Beniak agreed that Plaintiff needed counseling for moderate to severe depression and stress.  (Tr. 589.)

Plaintiff followed up with Dr. Downs on April 24, 2006, and reported that he was very angry since reading his psychiatrist's report, which criticized his current medication regimen.  (Tr. 668.)  His pain was at a level five out of ten and sometimes spiked to nine.  (*Id.*)  Plaintiff reported doing farm chores for his dad, including planting some seedlings.  (*Id.*)  Recently, he had threatened suicide. (Id.)  There was also an incident where loggers came on his dad's land, and Plaintiff threatened them with a gun.  (*Id.*)  And, Plaintiff was verbally abusing his wife.  (*Id.*)

Plaintiff's daily routine for the past few weeks was getting up at two in the morning and "putzing around" for five hours before returning to bed.  (*Id.*)  He spent hours organizing the garage and chicken coop, but felt overall aimless. (*Id.*)  On a more positive note, Plaintiff's QRC was helping him look into a job fixing clocks.  (Tr. 704.)  Dr. Downs recommended decreasing Effexor and starting Paxil.  (Tr. 705.)  Dr. Downs opined Plaintiff should not be job searching until his psychiatric issues were addressed.  (*Id.*)

Dr. Downs referred Plaintiff to Licensed Psychologist Ruth Olson at Duluth Clinic for a psychosocial evaluation.  (Tr. 663.)  The evaluation was done on May 3, 2006, and was based on clinical interview.  (*Id.*)  Plaintiff described his work injury, surgery and chronic pain.  (*Id.*)  He reported having numerous nightmares, and flashbacks of his work injury during waking hours.  (*Id.*)  His flashbacks were accompanied by heightened anxiety, isolation, fear, avoidance, and general psychological distress.  (*Id.*)  He also became more combative in his relationship with his wife.  (*Id.*)

Plaintiff reported functional limitations from pain including limited walking, standing, lifting, bending, reaching, sleeping, recreational activity, house work, yard work, employment and stair climbing.  (*Id.*)  He used to be active, so being sedentary made him depressed and agitated.  (*Id.*)  Olson concluded Plaintiff was suffering from PTSD, anxiety and depression.  (Tr. 665.)  She recommended teaching cognitive and behavioral coping strategies.  (*Id.*)

Plaintiff then saw Dr. Downs on May 5, 2006, with concerns that his symptoms were changing due to brain swelling.  (Tr. 666.)  His symptoms included mildly blurry vision with intermittent tinnitus, nightmares, and feeling edgy and depressed.  (*Id.*)  Dr. Downs thought Plaintiff's symptoms were due to withdrawal from Effexor, and he prescribed Paxil.  (*Id.*)  Dr. Downs opined,

> I consider [Plaintiff] to be at risk for harming himself or possibly others and I certainly perceive of him as not handling stress well.  In my judgment, he should not be involved in a job search at this time and needs to have a stable functioning medication regimen as well as adjustment counseling and facilitation of coping skills before he can consider a return to the work world.

(Tr. 667.)

In Plaintiff's first therapy session on May 11, 2006, Plaintiff stated that he wanted to learn to better control his reactions.  (Tr. 812.)  When he returned on May 25, he reported some minor improvement and increased awareness of when his feelings and stress were escalating.  (*Id.*)

On May 31, 2006, Plaintiff told his psychologist he had three good days in a row.  (Tr. 811.)  The next day, Plaintiff told Dr. Downs that he had a three day stretch without conflict with his wife but then "flew off the handle."  (Tr. 700.)  Plaintiff's wife told Dr. Downs Plaintiff had threatened to blow the back of her head off, but all of their guns had been locked away so Plaintiff did not have access.  (*Id.*)  Plaintiff's ankle pain was "status quo," and he rated his pain at four out of ten, which Plaintiff considered well controlled.  (*Id.*)

Dr. Downs assessed brain injury with concussion.  (*Id.*)  He opined that he could not rule out the possibility of drug-induced mental changes from the medication Amitriptyline.  (*Id.*)  Dr. Downs completed a "Report of Workability" form for Plaintiff.  (Tr. 694.)  He diagnosed traumatic brain injury and osteochondritis dessicans of the left ankle, and he checked a box on the form to indicate Plaintiff could return to sedentary work, lifting ten pounds maximum with only occasional walking and standing.  (*Id.*)  He noted if Plaintiff were to lift more than ten pounds, he would need an assistive device.  (*Id.*)

On June 15, 2006, Plaintiff told his psychologist he was stressed about his disability settlement.  (Tr. 811.)  He was overwhelmed by the decisions he had to make.  (*Id.*)  He did, however, report an increase in patience and decrease in anger outbursts the last week.  (*Id.*)  On June 22, Plaintiff reported staying in bed and being more irritable.  (*Id.*)

Plaintiff's wife called Psychologist Olson on June 27, 2006, to report her fear of her husband's anger.  (Tr. 810.)  Plaintiff's wife was concerned that Plaintiff had guns, but she said his father had locked the guns away.  (*Id.*)  Plaintiff saw Olson that day and said he had not slept for five nights.  (*Id.*)  He was very angry about "the system" and not receiving his settlement check.  (*Id.*)  Plaintiff talked about cleaning his rifle that morning and shooting it into the woods to test it.  (*Id.*)  He agreed with Olson not to use weapons while he was working on anger management.  (*Id.*)

24

Plaintiff saw Psychiatrist Michael Messer at Duluth Clinic on June 28, 2006, for an evaluation.  (Tr. 825.)  Plaintiff complained of chronic pain, severe anxiety, severe depression and mood swings.  (*Id.*)  He had trouble sleeping and was lashing out at his wife.  (*Id.*)  He was impulsive and obsessive and could not go out in public by himself.  (*Id.*)  Plaintiff also reported having blackouts with rage, not remembering what he had done or unaware of what he was doing.  (*Id.*)  Plaintiff reported it was good for him to live on his father's farm because he had less contact with the public.  (Tr. 825-26.)

On examination, Plaintiff was alert and oriented, but his mood was dark and depressed. (Tr. 826.)  He had a foreshortened sense of his future and was abusive to others.  (*Id.*)  His concentration and attention were poor.  (*Id.*)  Dr. Messer assessed a GAF score of 50,[7] and he instructed Plaintiff to discontinue Xanax and start Klonopin.  (*Id.*)  He also prescribed Inderal, and Tegretol for episodes of rage.  (*Id.*)

As of July 4, 2006, Plaintiff completed six individual therapy sessions with Psychologist Olson.  (Tr. 799.)  Plaintiff told Olson he tried to help with things around his father's farm, particularly fixing mechanical things.  (*Id.*)  He reported significant sleep disruption due to ankle pain and flashbacks of his work accident.  (*Id.*)  He had nightmares on almost a nightly basis and had difficulty being around people.  (*Id.*)  He was having difficulty controlling his anger.  (*Id.*)  Anxiety was

---

[7]     A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  *DSM-IV-tr* 34.

significantly interfering with his life, and had not improved aside from the fact that he was able to go to his appointments.  (*Id.*)  Plaintiff's wife reported that Plaintiff had an increase in strange behaviors, including use of weapons on the farm. (Tr. 799-800.)  Plaintiff said the weapons calmed him but agreed with Olson that a person working on anger management should not work with weapons as a way of calming.  (Tr. 800.)

Olson noted that Plaintiff was also engaging in obsessive compulsive types of behavior around the farm.  (*Id.*)  Olson strongly recommended continued therapy.  (*Id.*)  Plaintiff was more relaxed and less agitated when he met with Olson on July 11, 2006.  (Tr. 809.)  He was on new medications and had received his settlement check from workers compensation.  (*Id.*)  Plaintiff felt he was doing better with anger and frustration.  (*Id.*)  On July 25, 2006, Plaintiff continued to be depressed but felt better if he was busy.  (Tr. 809.)  He continued to be anxious.  (*Id.*)

When Plaintiff saw Olson on July 31, 2006, he appeared much more relaxed with increased concentration.  (Tr. 808.)  Plaintiff reported depressive symptoms of not wanting to get out of bed, sadness, and loss of function.  (*Id.*) The following week, Plaintiff was very stressed after arguing with his wife.  (*Id.*) His depression was significant.  (*Id.*)  On August 14, he appeared more relaxed again.  (*Id.*)

On August 14, 2006, Dr. James Stevenson completed a "Physical Residual Functional Capacity Assessment" form regarding Plaintiff at the request

of the SSA.  (Tr. 714–21.) Dr. Stevenson opined Plaintiff could occasionally lift and carry twenty pounds, and ten pounds frequently.  (Tr. 715.)  Plaintiff could stand and/or walk for six hours, and could also sit for six hours in an eight hour workday.  (*Id.*)  Plaintiff could never climb ladders, ropes or scaffolds but could occasionally climb ramps or stairs, and occasionally kneel, crouch or crawl. (Tr. 716.)  Plaintiff could frequently balance or stoop.  (*Id.*)

Plaintiff underwent a psychological consultative examination with Dr. Marcus Desmonde on August 29, 2006, at the request of a DDS examiner. (Tr. 724-26.)  Dr. Desmonde reviewed some of Plaintiff's medical records and interviewed Plaintiff.  (Tr. 724.)  Plaintiff reported he had not been able to go back to work since he was hit on the head and sustained left ankle injury in September 2002.  (*Id.*)  His workers compensation claim was now settled.  (*Id.*)  His pain was baseline at seven out of ten, and Ultram took the edge off his pain.  (*Id.*)

As for daily activities, Plaintiff talked on the phone to his family and a few close friends most nights.  (Tr. 725.)  He occasionally went shopping with his wife and would not go anywhere alone.  (*Id.*)  He was most comfortable at home with his wife and pets.  (*Id.*)  Plaintiff described his physical symptoms as very serious and debilitating, and together with his night terrors, he believed himself to be "100% disabled."  (*Id.*)  He admitted to depression, sleep disturbance and extreme irritability characterized by fits of rage and throwing things.  (*Id.*)  He had anxiety symptoms, especially if he had to go somewhere alone.  (*Id.*)

On mental status examination, Plaintiff was oriented and remembered six digits forward and three digits in reverse. (*Id.*)  He computed serial 7 additions and subtractions quickly and accurately. (*Id.*)  His short term and long term memory were intact. (*Id.*)  Dr. Desmonde diagnosed alcohol dependence in remission, cannabis abuse by history, adjustment disorder with mixed anxiety and depressed mood, and post traumatic stress disorder. (Tr. 726.)  Dr. Desmonde assessed a GAF score of 55-65.[8] (*Id.*)  He opined that Plaintiff was capable of understanding simple to moderately complex instructions and could carry out tasks within limitations set by a physician. (*Id.*)  Dr. Desmonde believed Plaintiff could interact with supervisors, co-workers and the general public but may have difficulty tolerating the stress and pressure of full-time competitive employment due to chronic pain complaints. (*Id.*)

On August 21, 2006, Plaintiff was feeling less agitated and depressed and sleeping better since his medication change. (Tr. 807.)  Dr. Downs noted that Plaintiff's new medications were Clonazepam, BuSpar and Paxil. (Tr. 698.)  Plaintiff reported he had an emotional "blowup" the prior day due to stress from his social security status. (*Id.*)  He argued with and grabbed his wife but did not escalate from there. (*Id.*)  Plaintiff rated his symptom level and his ankle pain at seven out of ten. (*Id.*)  Dr. Downs treated Plaintiff with osteopathic manipulation and noted Dr. Messer would treat Plaintiff's mood lability. (Tr. 699.)  Dr. Downs

---

[8]     A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational or school functioning. *DSM-IV-tr* 34.

completed a "Report of Workability" form, and opined that Plaintiff could do sedentary work and lift up to twenty pounds, with periodic postural changes and avoiding stressful situations working with others. (Tr. 707.)

Olson summarized her twelve individual therapy sessions with Plaintiff as of September 4, 2006. (Tr. 796.) Plaintiff and his wife had moved in with Plaintiff's father on his farm, and there was significant stress in their living situation. (*Id.*) Plaintiff had settled his workers compensation claim but still had difficulty moderating his feelings and not overreacting emotionally. (*Id.*) His anxiety and depression significantly interfered with his life. (*Id.*) Dr. Messer was managing Plaintiff's psychiatric medications, and Plaintiff seemed overall less physically agitated. (*Id.*) Plaintiff was concerned about finding employment, given his limitations. (*Id.*) Olson recommended continued therapy. (Tr. 797.)

On September 6, 2006, Dr. P.E. Shields, a licensed psychologist, completed a "Mental Residual Functional Capacity Assessment" form regarding Plaintiff at the request of the SSA. (Tr. 730–32.) Dr. Shields opined that Plaintiff had the ability to perform routine, repetitive tasks with adequate persistence and pace, and to sustain brief and superficial contact with others in an ordinary routine without special supervision. (Tr. 732.) Dr. Shields opined Plaintiff would be able to tolerate the routine stressors of a routine, repetitive work setting. (*Id.*) Dr. Shields also completed a Psychiatric Review Technique form. (Tr. 738-50.) He indicated that Plaintiff had mild cognitive weaknesses that were not a barrier to returning to work. (Tr. 739.) He found Plaintiff to have a medically

29

determinable affective disorder.  (Tr. 741.)  Under the "B criteria" of the listing for

affective disorder, Dr. Shields opined Plaintiff had mild restriction in activities of

daily living, moderate difficulties in maintaining social functioning, moderate

difficulties in maintaining concentration, persistence or pace, and one or two

episodes of decompensation.  (Tr. 748.)

When Plaintiff saw his psychologist on September 26, 2006, he was in

increased pain, which he attributed to the weather.  (Tr. 806.)  He had difficulty

getting out of bed and was moderately depressed, with symptoms of apathy and

poor sleep.  (*Id.*)  He and his wife would be moving from a farm into an

apartment, and Plaintiff had difficulty with transitions.  (*Id.*)

On November 4, 2006, Plaintiff's psychologist noted that Plaintiff had been

experiencing significant stress as a result of "life transitions" the last two months.

(Tr. 794.)  His anxiety and depression increased, and his sleep was more

disrupted.  (*Id.*)  He had made some gains in moderating his stress but wished to

see a new psychologist.  (*Id.*)  Olson referred him to Todd Heggestad.  (*Id.*)

When Plaintiff saw Dr. Downs on November 14, 2006, Plaintiff was

studying dock repair, and he was rearranging his work space and getting ready

to print business cards.  (Tr. 696.)  He rated his pain level 5 ½, and also

complained of left knee and neck pain.  (*Id.*)  Dr. Downs diagnosed post

concussion syndrome; thoracic sprain; somatic dysfunction of the cervical region,

thoracic region and neck; and nonallopathic lesion of the abdomen.  (*Id.*)

On November 19, 2006, Dr. Palkert completed a "Health Care Provider Report" form regarding Plaintiff.  (Tr. 752.)  She indicated Plaintiff's diagnosis was "OCD lesion of talus[,]" and this was a work-related injury.  (*Id.*)  Plaintiff reached maximum medical improvement on December 20, 2005.  (*Id.*)  Dr. Palkert opined Plaintiff sustained a permanent partial disability that was 12% of the whole body.  (*Id.*)

Plaintiff's wife contacted Dr. Messer on August 14, 2006, and reported Plaintiff was having more periods of anger and hostility.  (Tr. 823.)  When Plaintiff saw Dr. Messer, he admitted he was easily enraged but there were other times he felt he was making some progress with his mood.  (*Id.*)  On examination, Plaintiff was alert, calm and euthymic, and his attention and concentration were within normal limits.  (*Id.*)  Dr. Messer increased each of Plaintiff's medications: BuSpar, Paxil, Klonopin and Tegretol.  (*Id.*)

Plaintiff next saw Dr. Messer on October 26, 2006, and said he was doing somewhat better.  (Tr. 821.)  Plaintiff said he felt more stable and was less aggressive.  (*Id.*)  He had some frustrations related to moving to a new home but was handling it better than expected.  (*Id.*)

On December 6, 2006, Plaintiff's wife contacted Dr. Downs and stated Plaintiff was increasingly verbally abusive and sleeping with a pistol under his

pillow.  (Tr. 763.)  Dr. Downs started Plaintiff on a two-week trial of Lamictal.[9]
(*Id.*)

Dr. Downs referred Plaintiff to Licensed Psychologist Todd Heggestad, who treated Plaintiff in six sessions between November 24, 2006 and January 2007.  (Tr. 767.)  The focus of the sessions was to teach self-soothing and calming, use of a memory notebook, and dealing with irritability.  (*Id.*)  At the end of treatment, Plaintiff's short-term goals were only partially met.  (Tr. 768.)  Plaintiff also reported he had to discontinue Lamictal.  (Tr. 802.)

When Plaintiff saw Dr. Messer on March 26, 2007, Plaintiff was pleasant, cooperative and euthymic.  (Tr. 817.)  Plaintiff's present medications were Alprazolam (Xanax), BuSpar, Paxil, Ultram and Tylenol.  (*Id.*)  Plaintiff could not afford Lamictal, and his insurance would not pay for his therapy with Todd Heggestad.  (*Id.*)

Plaintiff followed up with Dr. Downs on April 24, 2007, and reported pain in his neck, ankle and mid back at a severity level four out of ten.  (Tr. 831.)  Plaintiff thought he had better impulse control but admitted he was still hard on his wife.  (*Id.*)  His insurance would no longer pay for counseling.  (*Id.*)  Plaintiff was working as a clock smith up to 35 hours per week.  (*Id.*)  He enjoyed being able to work at odd hours.  (*Id.*)  Dr. Downs diagnosed neck sprain and treated Plaintiff with osteopathic manipulation.  (Tr. 832.)

---

[9]   Lamictal is an anti-epileptic drug that is also indicated for the treatment of Bipolar I disorder, to delay the time of occurrence of mood episodes.  *PDR* at 1531-33.

On May 14, 2007, Plaintiff told Dr. Downs he had not taken his pain medication for 24 hours because he suspected it was causing his tinnitus, which was preventing him from concentrating and sleeping.  (Tr. 829.)  Plaintiff also reported having recurrent nightmares.  (*Id.*)  Dr. Downs noted "tinnitus appears to be related to his cranial restrictions as the tinnitus cleared after cranial mobilization."  (*Id.*)  Dr. Downs treated Plaintiff with osteopathic manipulation. (*Id.*)

Plaintiff was brought to the emergency room at St. Mary's Medical Center in Duluth by the police on June 10, 2007, after he threatened to shoot himself in the head and went to get a gun.  (Tr. 836.)  Plaintiff admitted he had thoughts of shooting himself, and he had many guns at home.  (*Id.*)  Plaintiff reported he was under stress from PTSD and nightmares.  (*Id.*)  Plaintiff was placed on a 72-hour hold and transferred to Miller Dwan for a psychiatric evaluation.  (Tr. 836–37.)

Plaintiff saw Dr. Messer at Miller Dwan and reported his mood had been very good the previous week.  (Tr. 843.)  Then, he had an argument with his wife and threatened to kill himself.  (*Id.*)  Plaintiff tested positive for marijuana, but he denied it.  (*Id.*)  On mental status examination, he was pleasant, cooperative and euthymic.  (Tr. 844.)  Dr. Messer diagnosed depressive disorder, NOS; cognitive disorder secondary to traumatic brain injury; and assessed a GAF score of 60. (*Id.*)

Plaintiff was living off his workers compensation settlement and trying to start a new business repairing clocks.  (Tr. 846.)  Plaintiff's wife asked that he not

be discharged because she was scared.  (Tr. 847.)  The next day, Plaintiff called and reported she discovered Plaintiff had taken too many of his medications, and that was why he was "out of it."  (*Id.*)  When speaking to a new counselor that day with Plaintiff's wife present, Plaintiff snapped at the counselor and sarcastically said he was addicted to his Xanax and his pills.  (Tr. 849.)

The next day, Plaintiff reported a history of chemical abuse including cannabis, methamphetamine, and cocaine.  (Tr. 850.)  He denied recent use, but he had tested positive for THC.  (*Id.*)  He admitted to sharing his pain medication with his adult son, whom he said had dental pain.  (*Id.*)  Plaintiff refused chemical dependency treatment.  (*Id.*)  Later that day, Plaintiff's wife reported she had removed the guns from the home and was pleased Plaintiff would return home that day.  (*Id.*)

Plaintiff saw Dr. Messer on July 19, 2007, and reported he was trying to work things out with his wife and reduce his anger.  (Tr. 867.)  On examination, Plaintiff was euthymic, interactive, pleasant and insightful.  (*Id.*)  On July 25, Plaintiff saw Dr. Downs for neck pain, and was treated with osteopathic mobilization.  (Tr. 886–87.)

On November 6, 2007, Plaintiff reported to Dr. Messer that he overdosed on Xanax and Ultram during the last week of August and had been very sick.  (Tr. 880.)  His wife now controlled his medications, and Plaintiff was irritable and depressed.  (*Id.*)

34

Plaintiff saw Dr. Downs the next week.  (Tr. 884.)  Dr. Downs noted Plaintiff was off all medications except Paxil and limited Xanax, which his wife controlled.  (*Id.*)  Plaintiff used Tylenol for pain relief.  (*Id.*)  Plaintiff admitted he overdosed after his discharge from the hospital.  (*Id.*)  Plaintiff also admitted using marijuana ten days ago, and that it calmed him.  (*Id.*)  He reported that he was now working long hours in his clock repair business.  (*Id.*)  Plaintiff thought he was getting better controlling his anger.  (*Id.*)  On examination, he seemed calmer than on his last visits.  (*Id.*)  He still appeared depressed.  (*Id.*)

In response to a letter from Plaintiff's attorney on February 6, 2008, Dr. Downs answered a number of questions about Plaintiff's condition.  (Tr. 898-900.)  Dr. Downs stated the bone under the cartilage of Plaintiff's left talar dome had died and collapsed, thus, being on his feet aggravated Plaintiff's pain. (Tr. 898.)  Plaintiff needed a cane to walk "more than across the room."  (*Id.*) Plaintiff also had traumatic brain injury, which manifested in anger.  (*Id.*)  Plaintiff had anxiety and depression with features of post traumatic stress disorder, which were treated by Dr. Messer.  (Tr. 899.)

Dr. Downs stated that Plaintiff "does manage to function to a degree as a clock smith."  He added that Plaintiff's level of concentration and fragmented work might not be tolerated by an employer.  (*Id.*)  Dr. Downs stated that the bone under the cartilage of Plaintiff's left talar dome had died and collapsed. (Tr. 898.)  Plaintiff's most impairing condition was emotional lability associated with traumatic brain injury.  (*Id.*)  Dr. Downs opined:

> It would be my opinion that [Plaintiff] should be considered disabled under Mental Impairments based on his difficulty with social functioning. His depression, difficulty with organization and judgment further contribute to his cognitive difficulties.

(*Id.*) Dr. Downs also opined that Plaintiff's chronic sprains and musculoskeletal pains were not disabling but impaired his ability to function in the workplace and to function as a highly efficient clock smith. (*Id.*) Dr. Downs suggested that Plaintiff was able to do clock smith work because he was able to pace himself, but he would not be able to sustain full-time work in a competitive environment with minimal absenteeism. (Tr. 900.) This was, in part, because there would be many days when Plaintiff "would throw in the towel due to anger, apathy, or frustration." (*Id.*)

## III. Testimony at the Administrative Hearing

### Plaintiff's Testimony

Plaintiff testified as follows at the hearing before the ALJ. He is married and has one adult step-son who does not live with him. (Tr. 30.) Plaintiff's only income is from his clock repair business, and his income varied and averaged $1,100.00 a month gross. (Tr. 31.) The business was not making a profit. (Tr. 53.) Plaintiff made "house calls" on occasion, if a customer required it. (Tr. 31.) Other than those occasions, he did not deal with the public. (Tr. 47.) On average, Plaintiff worked two or three days out of seven for less than eight hours a day. (Tr. 46.) Plaintiff's wife handled the paperwork and Plaintiff did the mechanical repairs. (Tr. 31.) Plaintiff had about six months training to learn the

clock repair business.  (Tr. 33-34.)  Prior to that, he completed the ninth grade and later obtained his GED.  (Tr. 34.)  Plaintiff also had training in machine tool technology and was a machinist for fourteen years.  (Tr. 35.)

Plaintiff took care of his own personal needs and helped with household chores.  (*Id.*)  He could not go grocery shopping because he had outbursts and tended to create a scene.  (*Id.*)  He had not been grocery shopping for years, and it was always highly likely that he would have an outburst.  (Tr. 36.)

Plaintiff estimated he could walk about a block using a cane.  (*Id.*)  He needed the cane because he had severe left ankle damage.  (Tr. 37.)  When he walked on the ankle without the cane, he felt sharp stabbing pain in his ankle, and he had difficulty balancing.  (*Id.*)  Plaintiff also wore a brace all the time to keep the bones of the ankle in line.  (Tr. 37–38.)  The weather and his activity level affected the severity of his ankle pain.  (Tr. 37.)  Plaintiff had been taking pain medication, but it started making him irritable, so he stopped about a year ago.  (Tr. 40.)  Plaintiff also no longer took medication for depression or PTSD.  (Tr. 43.)

Plaintiff was hospitalized for psychiatric reasons for three days in July 2006, but he did not remember what brought it on.  (Tr. 39.)  Plaintiff argued frequently with his wife, and he could not predict when he would snap and start an argument.  (Tr. 42.)

Plaintiff had some hearing loss in both ears and constant ringing in the ears that was very frustrating to him.  (Tr. 44.)  He also had neck pain and trouble

sleeping caused by pain and nightmares.  (Tr. 45.)  He took Tylenol for pain.

(*Id.*)  Plaintiff could no longer hunt or fish, so he watched television for fun.

(Tr. 39.)

### Testimony of Becky Paulson

Plaintiff's wife also testified at the hearing.  (Tr. 48.)  She did not allow

Plaintiff to go out in public because he had outbursts.  (Tr. 49–50.)  Plaintiff could

handle quick errands, like buying a gallon of milk or getting gasoline.  (*Id.*)  When

Plaintiff went to a customer's home, his wife went with, and she also handled the

customer phone contact.  (Tr. 50.)  Plaintiff's wife said that Plaintiff had night

terrors,[10] not nightmares.  (Tr. 48.)

When Plaintiff walked down the stairs carrying a laundry basket, it caused

his ankle to swell, which could last a couple days.  (Tr. 51.)  An active day for

Plaintiff would be going up and down the stairs four times.  (*Id.*)

Plaintiff worked on clock repair around the schedule of cartoons he liked to

watch.  (Tr. 52.)  He sang cartoon songs with made up lyrics, which his wife

believed was an obsessive compulsive behavior.  (*Id.*)  Plaintiff liked to do his

repair work at night when others were sleeping.  (Tr. 52-53.)  His wife thought he

might work at night to prevent lashing out at her when he became frustrated.

(*Id.*)  Plaintiff's only other social contact was his dad.  (Tr. 55.)

---

[10]    Night terrors is "a childhood disorder in which a child awakes screaming
with fright, the distress persisting for a time during a state of semiconsciousness."
*Stedman's Medical Dictionary* 1320 (28th ed. 2006).

**Medical Expert Testimony**

Dr. Andrew Steiner testified as a medical expert at the hearing.  (Tr. 56.)
Dr. Steiner opined Plaintiff's physical impairments would not meet or equal a
medical listing.  (Tr. 58.)  Dr. Steiner explained that Plaintiff's ankle problem was
primarily that of pain without findings of deformity or loss of motion or strength
that would lead to a listing consideration.  (*Id.*)  Dr. Steiner did not believe there
was a problem of instability of Plaintiff's ankle, but the pain was present due to
inflammation, like an arthritic condition.  (*Id.*)  Dr. Steiner opined Plaintiff's
physical residual capacity would be for sedentary work as far as lifting and time
on the feet.  (*Id.*)  Plaintiff would also be restricted from using his left ankle for
foot pedal activities, and he would be precluded from kneeling, crawling,
crouching and climbing ladders, ropes and scaffolds.  (*Id.*)  Plaintiff could
occasionally climb stairs and could not work in air polluted environments due to
asthma.  (Tr. 58-59.)  Dr. Steiner testified it would be beyond his area of
expertise to testify about traumatic brain injury.  (Tr. 59.)

In response to questioning by Plaintiff's attorney, Dr. Steiner testified that
Plaintiff would be restricted to sedentary level work due to his ankle pain.  He
further opined that Plaintiff should be limited to no left ankle pedals, no kneeling
crouching or crawling, and no ladders, ropes, and stairs and that claimant's
asthma would prohibit any work involving air pollution.  Dr. Steiner also stated
that walking on stairs or on uneven ground would be problematic for Plaintiff and
that Plaintiff would be limited to being on his feet for two hours out of an eight

hour day.  Dr. Steiner opined that Plaintiff would be able to stand, while being

able to shift his weight or with some support, for one hour at a time.   Dr. Steiner

did not see enough documentation of neck problems to give Plaintiff any neck

restrictions.  (Tr. 60.)  Dr. Steiner explained that his limitation to sedentary work

accounted for the pain he would expect Plaintiff's ankle injury to cause.  (*Id.*)

### Vocational Expert Interrogatories

The ALJ submitted interrogatories to William Villa to obtain his vocational

expert testimony.  (Tr.292–96.)  The ALJ propounded two hypothetical scenarios:

Hypothetical #1

Sedentary work defined as lifting up to 10 pounds occasionally and 5
pounds frequently and standing and/or walking up to 2 hours in an 8
hour workday with no limitations on sitting.  The individual is
restricted from using foot pedals with the left lower extremity and can
only occasionally climb stairs.  The individual is precluded from
kneeling, crawling, crouching, use of ladders or ropes and high
exposure to high concentrations of air pollutants such as dusts,
fumes, gases, etc.  In addition, the individual is limited to routine,
repetitive tasks and instructions with only brief and superficial
contacts with others.

Hypothetical #2

In addition to the limitations in Hypothetical #1, the individual is
precluded from performing tasks on uneven ground or that require
the use of stairs.  Additionally, the individual is unable to stand more
than one hour continually and would require a support such as a
cane or other assistive device.

(Tr. 296.)

Villa responded that if Plaintiff had the residual functional capacity outlined

in Hypothetical #1 or #2, and the same age, education and work experience as

Plaintiff, he could not perform his past relevant work.  (Tr. 293.)  Under

Hypothetical #1, Villa responded that Plaintiff could perform other work including:

semiconductor bonder, DOT Code 726.685.066, with 1,700 such jobs in the

economy; optical polisher DOT Code 713.684-038, with 700 such jobs; and

sutures gauger, DOT Code 712.687-018, with 600 such jobs.  (Tr. 294.)  Under

Hypothetical #2, Villa responded there were no jobs Plaintiff could perform.  (*Id.*)

## IV.    The ALJ's Decision and Findings

On August 25, 2009, the ALJ issued a decision concluding that Plaintiff

was not under a disability as defined by the Social Security Act at any time from

September 19, 2002 through the date of the decision, therefore denying Plaintiff's

applications for disability insurance benefits and supplemental security income.

(Tr. 11-21.)  The ALJ followed the five-step procedure as set out in the Code of

Federal Regulations.  *See* 20 C.F.R. § 404.1520(a)(4), § 416.920(a)(4).  The

Eighth Circuit Court of Appeals has summarized the five-step procedure as

follows:  (1) whether the claimant is currently engaged in "substantial gainful

activity"; (2) whether the claimant suffers from a severe impairment that

"significantly limits the claimant's physical or mental ability to perform basic work

activities"; (3) whether the claimant's impairment "meets or equals a

presumptively disabling impairment listed in the regulations (if so, the claimant is

disabled without regard to age, education and work experience)"; (4) "whether

the claimant has the residual functional capacity ["RFC"] to perform his or her

past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform

his or her past relevant work then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform." *Fines v. Apfel*, 149 F.3d 893, 894-95 (8th Cir. 1998).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of September 19, 2002, therefore meeting the requirement at the first step of the disability determination procedure.  (Tr. 13.)  At step two, the ALJ found that Plaintiff had severe impairments of post concussion syndrome with traumatic brain injury, left ankle osteochondritis dessicans, depression with anxiety, cervical spondylosis with back and neck pain, alcohol dependence and marijuana abuse, tinnitus and hearing loss. (Tr. 13.)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 14-15.)  The ALJ concluded that Plaintiff had a mild restriction in activities of daily living, moderate restriction in social functioning and moderate difficulties with concentration, persistence or pace.  (Tr. 15.)  Plaintiff had no episodes of decompensation of extended duration.  (*Id.*)  The ALJ also concluded the "C criteria" of the listing were not met.  (*Id.*)

At step four of the disability determination procedure, the ALJ concluded that Plaintiff had the residual functional capacity to do the following:

> [P]erform sedentary/unskilled work as defined in 20 CFR
> 404.1567(a) and  416.967(a) as lifting up to ten pounds occasionally
> and five pounds frequently and standing and/or walking up to two
> hours in an eight hour workday with no limitations to sitting.  The
> individual is restricted from using foot pedals with the lower extremity
> and can only occasionally climb stairs.  The individual is precluded
> from kneeling, crawling, crouching, use of ladders or ropes and high
> exposure to high concentrations of air pollutants such as dusts,
> fumes, gases, etc.  In addition, the individual is limited to routine and
> repetitive tasks and instructions, with only brief and superficial
> contact with others.

(Tr. 15-16.)

In reaching this conclusion, the ALJ summarized the hearing testimony of

Plaintiff and the medical expert, Dr. Steiner.  (Tr. 16.)  The ALJ then summarized

Plaintiff's evaluation and treatment for his left ankle injury.  (Tr. 17.)  The ALJ

noted Plaintiff's inconsistent statements about pain in the medical record.  (*Id.*)

Plaintiff's ankle felt better, examination was normal, and he could walk longer

distances without a cane in April 2005.  (*Id.*)  Prior to surgery, his pain improved

with physical therapy, and was around a level five in severity on average.  (*Id.*)

In January 2006, Dr. Konowalchuk noted Plaintiff carried a cane but said it was

not clear he needed the cane to walk.  (*Id.*)  Plaintiff complained of few side

effects from medication.  (*Id.*)

The ALJ also found Plaintiff's daily activities to be inconsistent with the

severity of his complaints.  (*Id.*)  The ALJ noted that Plaintiff did housework,

chores on his father's farm, and worked part time as a clock smith, up to 35

hours a week.  (*Id.*)  In November 2007, Plaintiff bemoaned his long work hours

to Dr. Downs.  (*Id.*)

The ALJ noted there was a dispute among medical professionals about whether Plaintiff had PTSD.  (*Id.*)  Dr. Downs and Dr. Sivak agreed with the PTSD diagnosis, but Dr. Beniak strongly disagreed.  (Tr. 17–18.) Dr. Konowalchuk stated it was not clear from the medical records whether Plaintiff had PTSD.  (Tr. 17.)  All medical professionals diagnosed Plaintiff with depression, and the ALJ noted medication had improved Plaintiff's depression. (Tr. 18.)  The ALJ noted that the efficacy of Plaintiff's medication for his mood swings may have been affected by his use of marijuana, sharing medication with his step-son, and increasing and decreasing dosages himself.  (*Id.*)  The ALJ also noted Plaintiff declined mental health counseling in December 2003.  (*Id.*)

The ALJ then summarized evidence regarding the impact of Plaintiff's mental impairments on his ability to work.  (*Id.*)  The ALJ noted Dr. Beniak's opinion that Plaintiff had minor variations in attention, learning and short term memory, which were secondary to his psychiatric state.  (*Id.*)  He also noted Dr. Beniak's finding of moderate to severe depression, and Plaintiff's testimony of poor concentration.  (*Id.*)  The ALJ noted Plaintiff's poor concentration was observed by his physicians.  (*Id.*)  He noted Dr. Sivak's assessment of a GAF score of 37, and Dr. Downs' opinion that Plaintiff's poor concentration and fragmented work might not be tolerated by an employer.  (*Id.*)

The ALJ stated that treating and examining physicians opined that Plaintiff could return to work.  (*Id.*)  In May 2004, Dr. Palkert returned Plaintiff to work with restriction to a sitting job.  (*Id.*)  A year later, Dr. Palkert added limitations of no

prolonged standing, minimal walking, and no climbing, kneeling, squatting or lifting.  (*Id.*)  Dr. Downs limited Plaintiff to sedentary work in 2005, but later opined Plaintiff was disabled by mental impairments.  (*Id.*)  Dr. Barron also limited Plaintiff to sedentary work.  (Tr. 18-19.)  Dr. Konowalchuk limited Plaintiff to no prolonged standing or sitting, and opined Plaintiff had only mild mental deficits.  (Tr. 19.)  Dr. Murrey did not believe Plaintiff's mild cognitive weakness would prevent a successful return to work.  (*Id.*)  Dr. Beniak believed Plaintiff needed adjustment counseling and psychiatric medication management, but that Plaintiff was intelligent and would have a number of vocational options available. (*Id.*)  The ALJ noted Plaintiff's GAF scores over sixteen months ranged from 37 to 65.  (*Id.*)

The ALJ granted significant weight to the opinions of Dr. Steiner and Dr. Beniak because they were consistent with medical findings.  (*Id.*)  The ALJ did not grant great weight to Dr. Downs' opinion of Plaintiff's mental disability because Dr. Downs was a doctor of occupational medicine, and his opinion conflicted with the opinions of Dr. Beniak, a psychologist, and Dr. Messer, a psychiatrist.  (*Id.*)  The ALJ also accorded little weight to the opinions of Dr. Sivak and Dr. Desmonde, because they were inconsistent with the objective medical evidence and Plaintiff's activities of daily living.  (Tr. 19–20.)

The ALJ concluded that Plaintiff could not perform his past relevant work. (Tr. 20.)  Based on the responses to interrogatories by the vocational expert, the ALJ concluded Plaintiff could perform other work such as semiconductor bonder,

optical polisher, and sutures gauger, of which there were a significant number of jobs in the state of Minnesota.  (Tr. 20-21.)

## DISCUSSION

### I.    Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006).  "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as whole.'"  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (quotation omitted).  Substantial evidence is "more than a mere scintilla.  It

means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotations omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) (quoting *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Gavin*, 811 F.2d at 1199. "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Id.* In reviewing the administrative decision, "'[t]he substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.) The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.  *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

## II.    Analysis of the ALJ's Decision

Plaintiff raised two issues in support of his motion for summary judgment. First, Plaintiff contends that the ALJ failed to properly weigh the medical opinions, and that the ALJ should have adopted Dr. Palkert's restriction to a sitting job and Dr. Downs' opinion of Plaintiff's disabling mental impairments.  Plaintiff further contends the ALJ erred by only accepting part of Dr. Steiner's physical RFC opinion.  Second, Plaintiff argues there is no support in the record for a physical RFC that would allow Plaintiff to stand or walk two hours out of an eight hour workday without a supportive device.

In response, Defendant argues that substantial evidence supports the ALJ's assessment of the medical opinions.  Defendant contends that there are medical opinions in the record that Plaintiff could perform at least a range of sedentary work.  Defendant also submits there are inconsistencies in

Dr. Palkert's and Dr. Downs' treatment notes that undermine a restriction to less

than a sedentary range of work.  Defendant asserts that the ALJ was not

required to adopt the entirety of the medical expert's opinion, and the ALJ's

conclusions were properly based on the ALJ's independent review of the medical

evidence as a whole.  For the same reasons, Defendant contends that there is

substantial evidence in the record to support the ALJ's RFC finding that Plaintiff

could stand or walk two hours per workday.

### A.    Whether the ALJ Properly Weighed the Medical Opinions

> "A treating physician's opinion regarding an applicant's impairment
> will be granted controlling weight, provided the opinion is well-
> supported by medically acceptable clinical and laboratory diagnostic
> techniques and is not inconsistent with the other substantial
> evidence in the record."  *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir.
> 2000) (citation omitted).  The regulations require the ALJ to give
> reasons for giving weight to or rejecting the statements of a treating
> physician.  *See* 20 C.F.R. § 404.1527(d)(2).  Whether the ALJ gives
> great or small weight to the opinions of treating physicians, the ALJ
> must give good reasons for giving the opinions that weight.
> *Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir. 2001).  "The
> ALJ may discount or disregard such an opinion if other medical
> assessments are supported by superior medical evidence, or if the
> treating physician has offered inconsistent opinions."  *Hogan v.
> Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).  Moreover, a treating
> physician's opinion does not deserve controlling weight when it is
> nothing more than a conclusory statement.  *Piepgras v. Chater*, 76
> F.3d 233, 236 (8th Cir. 1996).  *See also Thomas v. Sullivan*, 928
> F.3d 255, 259 (8th Cir. 1991) (holding that the weight given to a
> treating physician's opinion is limited if the opinion consists only of
> conclusory statements).

*Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008).

Plaintiff asserts that the ALJ should have given controlling weight to

Dr. Palkert's opinion that he is limited to a sitting job.  When Dr. Palkert used the

phrase "sitting type job," it was unclear what restrictions she would place on standing and walking.  (Tr. 391, 476.)  But, on occasion, Dr. Palkert restricted Plaintiff to a sitting job and no prolonged standing or walking or "no standing/minimal walking."  (Tr. 473, 551.)  Thus, it is reasonable to conclude that Dr. Palkert defined a "sitting type job" as one requiring minimal standing and walking.

Similarly, Dr. Downs noted in a number of medical records that Plaintiff was restricted to "sedentary class work," without definition.   (Tr. 499, 694.)  But when Dr. Downs completed a form to indicate Plaintiff's restrictions, sedentary work was defined on the form as work that involves sitting but "a certain amount of walking or standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required only occasionally."  (Tr. 694, 707.) "Occasionally" was not defined.  (*Id.*)  At times, Dr. Downs gave more specific limitations including "limit walking/standing as much as possible" (Tr. 547), maximum two hours a day on feet (Tr. 501, 535), one hour per day on feet in multiple segments (Tr. 503), and "needs periodic postural changes"  (Tr. 707). Although Drs. Palkert and Downs did not give precise, consistent definitions of the "sitting type of job" or "sedentary work" Plaintiff was restricted to, the Court finds that their opinions, read in light of the record as a whole, would preclude standing for two hours at one time, contrary to the ALJ's RFC finding for a full range of sedentary work.  Therefore, the Court addresses whether the ALJ should have given the treating physicians' opinions controlling weight.

The first circumstance in favor of an ALJ granting a treating physician's opinion controlling weight—that the opinion is supported by medically acceptable diagnostic techniques—is present here because Plaintiff's MRI results showed a left ankle bone lesion with swelling and cysts, which did not heal after surgery. (Tr. 408, 475.)  Dr. Downs explained that Plaintiff's pain was aggravated by standing because the bone under the cartilage of Plaintiff's left talar dome had died and collapsed.  (Tr. 898.)   Dr. Steiner stated that  "there's a pain problem because of, it's inflammatory, the residual, cystic and degenerative changes and cysts and erosions have been documented at that joint."  (Tr. 58.)  Given the objective finding, the ALJ was required to provide good reasons for refusing to grant the treating physicians' physical RFC opinions controlling weight and refusing to grant significant weight to Dr. Steiner's standing limitation of one hour at a time with support.

The ALJ did not discuss why he did not grant controlling weight to Dr. Palkert's or Dr. Downs' physical RFC opinion.  In his summary of Dr. Palkert's treatment records, the ALJ acknowledged that Dr. Palkert restricted Plaintiff to a "sitting job with no prolonged standing, minimal walking, no climbing/kneeling, or squatting and no lifting."  (Tr. 18.)  The ALJ also recited Dr. Konowalchuk's restriction to "medium lifting capacity, with no prolonged sitting or standing." (Tr. 19.)

In evaluating the medical opinions of Plaintiff's physical RFC, the ALJ made the following statements:

> The opinions of the State agency doctors have been considered and
> to the extent they are consistent with the above residual functional
> capacity the undersigned has adopted them.  However the
> undersigned has chosen to reduce claimant's functional capacity to
> sedentary to incorporate claimant's reports of pain.  The record
> contains many medical opinions; however the undersigned has
> chosen to accord the opinions of Dr. Steiner and Dr. Beniak
> significant weight as they are consistent with medical findings. . . In
> sum, the above residual functional capacity assessment is supported
> by the opinion of Dr. Steiner, the claimant's reported activities of
> daily living, and the objective medical record.

(Tr. 19-20.)

The ALJ said that he gave significant weight to Dr. Steiner's opinion, but

Dr. Steiner testified that Plaintiff probably could not stand for two straight hours,

and would be limited to one hour standing at a time with "some support."  The

ALJ acknowledged this limitation when he summarized Dr. Steiner's testimony.

(Tr. 16.)  However, the ALJ did not include Dr. Steiner's standing limitation in his

physical RFC finding.

The ALJ explained that he did not grant controlling weight to the treating

physicians' physical RFC opinions or Dr. Steiner's testimony in its entirety in light

of Plaintiff's daily activities and the objective medical record.   For example, the

ALJ noted that objective medical records indicated Plaintiff had full strength and

range of motion in his left ankle, and instances where his pain improved.  (*See*

Tr. 382, 386, 475, 476, 495.)   It may be that Plaintiff may have full strength and

the ability to rotate his left ankle, but this does not change the fact that Plaintiff

also has, according to Dr. Downs, an unhealed bone lesion, a dead, collapsed

bone that caused Plaintiff pain with weight bearing.   Accordingly, the objective

medical record supports Dr. Palkert's RFC opinion of minimal standing and walking and Dr. Steiner's restriction to maximum standing one hour at a time with support.

The ALJ also based his RFC finding on Plaintiff's daily activities, noting that Plaintiff did housework, farm chores for his father, planted seedlings, and worked as many as 35 hours a week as a clock smith inconsistent with his allegation of pain.  (Tr. 17.)  The record indicates that Plaintiff's farm chores consisted primarily of fixing mechanical objects (Tr. 799).  These types of chores could have been done without standing or walking for two straight hours without a cane.  The same is true of Plaintiff's clock repair work.   Doing housework and planting seedlings would certainly require some standing and walking, but there is no evidence Plaintiff performed these activities for any prolonged period.  In fact, the longest period of Plaintiff standing or walking the Court can find in the record is of grocery shopping for forty minutes.  Since Plaintiff testified and told his medical providers that he typically walked only short distances without his cane, Plaintiff presumably used his cane while shopping for groceries for forty minutes.    (Tr. 238, 36-37, 495, 898.)

It is true that Dr. Konowalchuk questioned whether Plaintiff needed a cane to walk.  (Tr. 505.)  But Dr. Downs and Dr. Steiner explained that Plaintiff's bone lesion could cause pain with weight-bearing.   Thus, even assuming he had the strength and balance to walk, Plaintiff would probably use a cane to reduce his pain.   In sum, this Court finds that substantial evidence in the record does not

support the ALJ's decision to discount Drs. Palkert, Downs, and Steiner's physical RFC opinions.  For the same reasons, the Court agrees with Plaintiff's second argument – that there is no support in the record for a physical RFC that would allow Plaintiff to stand or walk two straight hours out of an eight hour workday without a supportive device.   As discussed below, because substantial evidence in the record supports a finding that Plaintiff's physical RFC precludes competitive employment, the Court need not reach Plaintiff's arguments concerning his mental impairments.

**B.      Whether the VE's Answers to Interrogatories Support a Remand for Award of Benefits.**

Plaintiff argues that reversal of the ALJ's decision and award of benefits is appropriate because the VE testified, based on a hypothetical question containing Dr. Steiner's physical RFC opinion, that there is no competitive employment Plaintiff could perform.  This Court agrees.   The second hypothetical in the VE interrogatories captured Dr. Steiner's testimony that Plaintiff is precluded from "performing tasks on uneven ground or that require the use of stairs[11] and is unable to stand more than one hour continually and would

---

[11]      The limitation on stair climbing and walking on uneven ground comes from the following exchange between Plaintiff's counsel and Dr. Steiner at the hearing:

> Q.      Dr. Steiner, as far as time on feet is concerned for Mr. Paulson sedentary allows up to two out of an eight-hour workday.  He's described the difficulty he has just walking across the room or going up and down a flight of stairs from time to time.  Would you limit it to no more than so many minutes at a given time?

require a support such as a cane or other assistive device." (Tr. 296, 58-59.)

Where a VE's testimony captures the concrete consequences of a claimant's

impairments, it constitutes substantial evidence in the record. *Porch v. Chater*,

115 F.3d 567, 572 (8th Cir. 1997).

In sum, the record before this Court does not support the ALJ's physical

RFC finding, and when the treating physicians' and medical expert's physical

RFC opinions are credited, the VE's testimony establishes there is no

competitive employment Plaintiff could perform. Therefore, this Court

recommends reversal of the ALJ's decision, and remand for an award of benefits.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's motion for summary judgment (Doc. No. 7), be **GRANTED**;

2.      The case be remanded for reversal and an award of benefits;

---

A.      I think that walking on stairs and walking by itself, especially walking on uneven ground would be different than standing so I don't think I'd limit time on feet beyond going, limit it to two hours in an eight-hour day.
Q.      You don't think he could stand, just stand for two straight hours?
A.      Probably not. Probably an hour perhaps if he's allowed to shift weight and have some support.

(Tr. 59.)

Tasks involving climbing stairs and walking on uneven ground would also be precluded by Drs. Palkert and Down's restrictions of no climbing and "no standing/minimal walking" (Tr. 501, 503, 551.) Plaintiff complained to Dr. Downs of difficulty walking on uneven surfaces. (Tr. 495, 499.)

3.      Defendant's motion for summary judgment (Doc. No. 13), be **DENIED**;

4.      This case be dismissed and judgment entered.


Date: November 21, 2011      _Jeffrey J. Keyes_____
                                          JEFFREY J. KEYES
                                       United States Magistrate Judge


Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **December 5, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **fourteen days** after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.